WILLIAMS, Chief Judge:
A jury convicted Marcus Dukes of mail fraud, 18 U.S.C.A. § 1341 (West 2000 & Supp.2006); interstate transportation of property obtained by fraud, 18 U.S.C.A. § 2314 (West 2000 & Supp.2006); and *41 money laundering, 18 U.S.C.A. § 1957(a) (West 2000 & Supp.2006). These convictions relate to Dukes’s leadership in a fraudulent investment scheme that targeted the African-American church community. Dukes appeals his convictions on numerous evidentiary grounds and, alternatively, contends that the district court erred in applying certain U.S. Sentencing Guidelines enhancements to his sentence. We affirm Dukes’s convictions, finding no reversible error. We nevertheless vacate Dukes’s sentence and remand for resentencing because we conclude that the district court erred in applying the guideline enhancement for “aggravating role” to Dukes’s sentence.
I.
A.
In 2000, Dukes and his business partner, Teresa Hodge, founded Financial Warfare Club (FWC), a Maryland nonprofit corporation.[1] They marketed FWC as a “synergistic financial network created specifically for the body of Christ.” (J.A. at 500.)[2] Dukes and Hodge, who are both African-American, claimed that FWC was created to generate wealth within the African-American community by promoting investment literacy among those who typically lacked knowledge of financial markets and by providing investment opportunities in companies that would purportedly generate revenue that would stay within the African-American community.
To that end, Dukes and Hodge primarily sought to grow FWC through presentations to African-American clergy and church groups. Invitations to FWC presentations were typically distributed during church services, and the pastor of the hosting church would usually introduce Dukes and Hodge to the attendees. Dukes littered FWC presentations with biblical references, often underscoring FWC’s purported goal of community financial empowerment by referencing the biblical passage Hosea 4:6, which states, “My people are destroyed for a lack of knowledge.”
FWC offered three membership levels. The top level, known as the “Founders Level,” required an initial payment of $2,550 and entitled the member to three financial literacy courses; 2,000 shares of stock in Global Com InterNetworks, Inc. (“GCI”), Integrated Solutions International, Inc. (“ISI”), and Genex, Inc., three “infrastructure” companies that Dukes and Hodge purportedly were developing; and the opportunity to buy additional shares of stock in the companies at preferred prices before their initial public offerings (IPOs). The intermediate level, known as the “Warriors” level, required an initial payment of $1,050 and entitled the member to two financial literacy courses, 500 shares of stock in each of the three companies, and the same opportunity to purchase more shares at preferred prices. The least expensive level, known as the “Believers” level, required an initial payment of $550 and entitled the member to one financial literacy course, 250 shares of stock in each of the three companies, and the opportunity to buy more shares at preIPO prices.
B.
Dukes and Hodge initially marketed FWC to smaller African-American Pentecostal churches. Their first church pres *42 entation was on September 27, 2000, at the Victorious Church of Jesus Christ in Camp Springs, Maryland. Dukes later hired Sam Hairston, the church’s pastor, to assist with marketing FWC in the greater church community.[3]
Dukes and Hodge presented FWC at churches around six or seven more times before the end of 2000. At the beginning of 2001, Dukes took FWC on the road, giving presentations at numerous churches throughout Georgia, Michigan, Ohio, New York, New Jersey, and Alabama.
Aside from appealing to potential investors’ religious feelings, Dukes and those who introduced him also told potential investors about his considerable investment experience, including experience at a Wall Street brokerage firm. Dukes told investors that he had extensive experience taking companies public, the most notable of which was a retail clothing store called Today’s Man. Dukes often noted in presentations that he had given financial advice to a church in Washington, D.C. and that, as a result, the church made $50,000 and two church members bought matching Porsche automobiles with their profits. To further assuage potential investors’ concerns, both Dukes and Hodge told investors that they personally invested a large amount of money — approximately $1,000,000 — in FWC. They also offered a money-back guarantee on any investment in FWC up to the time of the infrastructure companies’ IPOs.
FWC flyers and handouts explained to potential investors that the company was seeking 10,000 members. Dukes initially told potential investors that FWC would take GCI public sixty days after it had sold 5,000 FWC memberships, ISI public ninety days later, and Genex public ninety days after that. In later presentations, however, Dukes changed the projected timing of GCI’s IPO.[4] Dukes also stated on multiple occasions that ISI was obtaining banking licenses with the assistance of a former Washington, D.C. banking commissioner, that ISI officials had talked to fifty top state banking regulators, and that ISI would soon be operating a national African-American owned bank. Dukes and Hodge told FWC members that financial literacy courses would start within a few months of their investments.
C.
When it became apparent that FWC’s promised benefits (financial literacy courses and IPO profits) were not forthcoming, a number of FWC members requested a refund of their investments. Only a handful of members actually received a refund. When Dukes failed to respond timely to some FWC members’ complaints, some of those members contacted the Maryland Attorney General’s office. On March 5, 2001, the Maryland Securities Commissioner issued a cease- and-desist order against Dukes and Hodge, ordering them to stop offering or selling unregistered securities, including memberships in FWC, and to stop violating the anti-fraud provision of the Maryland Securities Act, Md.Code Ann., Corps. & Ass’ns §§ 11-101 tp 11-805 (LexisNexis *43 2005).[5] Dukes was served with a copy of the order on March 7, 2001. On the same day, and after he had received notice of the order, Dukes presented FWC at a large church in Perth Amboy, New Jersey, collecting approximately $200,000 in membership fees. Dukes returned the membership applications and fees to FWC’s office in Maryland.
On March 13, 2001, Dukes incorporated a new FWC entity in Washington, D.C. Around the same time, Dukes moved FWC out of its Maryland office.
On April 10, 2002, Dukes and Hodge entered into a consent decree with the Maryland Securities Commission. Pursuant to the terms of the decree, Dukes admitted to the Commission’s findings of fact. The decree also contained the Securities Commission’s legal conclusions that Dukes and Hodge had committed securities and investment fraud under the Maryland Securities Act, which Dukes neither admitted nor denied. In the decree, the Commission also repeated its orders to Dukes and Hodge to cease and desist from engaging in fraudulent investment activities.[6]
D.
On December 22, 2003, a grand jury sitting in the District of Maryland returned a fifteen-count superseding indictment against Dukes and Hodge, charging them with mail fraud, illegally transporting property obtained by fraud, and money laundering.[7] Dukes’s trial began on May 24, 2005.[8]
On June 8, 2005, the jury found Dukes guilty on all counts. Over numerous objections by Dukes to the presentence report (PSR), the district court sentenced Dukes to 120 months’ imprisonment, followed by 36 months’ supervised release, and ordered Dukes to pay $1,173,518 in restitution. Dukes timely appealed his convictions and sentence. We have jurisdiction over this appeal pursuant to 28 U.S.C.A. § 1291 (West 2006) (providing for appellate jurisdiction over “final decisions” of the district court) and 18 U.S.C.A. § 3742(a) (West 2000) (providing for appellate jurisdiction over a “final sentence” entered by the district court).
II.
On appeal, Dukes raises a number of evidentiary challenges to his convictions. “We typically review for abuse of discretion a district court’s evidentiary rulings.” United States v. Perkins, 470 F.3d 150, 155 (4th Cir.2006). If the challenging party failed to object below to admission of the evidence, however, we review only for plain error. United States v. Chin, 83 F.3d 83, 87 (4th Cir.1996). We address each of Dukes’s arguments in turn.
A.
Dukes’s first argument focuses on the district court’s admission of paragraph 14 of the consent decree between him and *44 Hodge and the Maryland Securities Commission. The Government’s theory at trial was that FWC was a vehicle for fraud from its inception and that Dukes never intended to offer financial literacy courses or take the three infrastructure companies public. Dukes’s defense was that he never had an intent to defraud and acted in good faith. During its case-in-chief, the Government asked a witness who had invested in FWC whether Dukes had ever told him that “none of the three infrastructure companies has any prospect for going public.” (J.A. at 748.) Dukes immediately objected to this question on the ground that there was no evidence that the companies had no chance of going public. In response, the Government sought to introduce paragraph 14 of the consent decree between Dukes and the Maryland Securities Commission. The paragraph states: “None of the three infrastructure companies has ever had any employees, contracts or revenues. None has any prospect for going public. Financial Warfare has no prospect for capturing 5% of the minority market.” (J.A. at 1915.)
Dukes objected again, this time on the ground that Dukes’s forward-looking statement in April 2002 was irrelevant to his earlier state of mind and improper to put before the jury. The Government informed the district court that Dukes had consented to the findings of fact in the decree. The court instructed the Government that it could ask its question but also instructed the Government to refrain from referencing the Securities Commission’s legal conclusions in the decree. Obviously reading from paragraph 14, the Government then asked the witness whether Dukes had ever told him that none of the three infrastructure companies has any prospects for going public, to which the witness replied, “No he did not.” (J.A. a 752.)
Dukes argues that his April 2002 admission that the three infrastructure companies had no prospects of going public at that time is irrelevant to determining his state of mind about the companies’ IPO prospects before issuance of the cease-and-desist order. He contends that admission of the paragraph was improper under Federal Rule of Evidence 408 because it likely misled or confused jurors into believing that his forward-looking statement in April 2002 reflected his belief about the companies’ viability before he received notice of the cease-and-desist order. The parties argue over whether Dukes preserved this argument through objection at trial, but the record plainly shows that he did. Nevertheless, we conclude that the district court did not err in admitting the factual findings contained in paragraph 14 of the decree.
Rule 403 provides that relevant evidence “may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury.” Fed.R.Evid. 403. Because Dukes “expressly consented,” (J.A. at 758), to the findings of facts in paragraph 14, they constitute adoptive admissions under Federal Rule of Evidence 801(d)(2)(B), which classifies as “not hearsay” a “statement of which the party has manifested an adoption or belief in its truth.”
These findings of fact were undoubtedly relevant to the Government’s case against Dukes. Although the probative value of Dukes’s admissions may be somewhat diminished by their timing, the only prejudice that flowed from their introduction at trial is the kind of prejudice inherent in all relevant evidence. See United States v. Williams, 445 F.3d 724, 730 (4th Cir.2006) (“It is worth remembering that the touchstone for excluding evidence under Rule 403 is not prejudice, but ‘unfair’ preju *45 dice.” (internal quotation marks omitted)); United States v. Russell, 919 F.2d 795, 798 (1st Cir.1990) (“Much of the Government’s evidence in a criminal case is damaging to the defendant; that is why it is offered. Evidence should be precluded only where it is unfairly prejudicial.”); 1 Stephen A. Saltzburg, Michael M. Martin & Daniel J. Capra, Federal Rules of Evidence Manual 403-9 (9th ed.2006) (“Evidence is not ‘prejudicial’ merely because it is harmful to the adversary. After all, if it didn’t harm the adversary, it wouldn’t be relevant in the first place.”). Dukes’s argument discounts the jury’s ability to consider evidence in context and evaluate evidence based on all of its characteristics, including its timing. We reject Dukes’s contention.
B.
Next, Dukes argues that the district court erred in allowing the Government to ask guilt-assuming hypothetical questions. Because Dukes objected at trial,[9] we review the district court’s admission of this testimony for abuse of discretion. United States v. Jackson, 327 F.3d 273, 298 (4th Cir.2003).
As noted above, once the district court overruled Dukes’s objection to the Government’s admission of the findings of fact contained in paragraph 14 of the consent decree, the Government asked a FWC investor the following questions:
Government: “Did Mr. Dukes ever tell you ... that none of the three infrastructure companies has any prospect for going public?”
Witness: “No, he did not.” Government: “And if he had told you that, would that have affected your decision to invest in Financial Warfare Club?”
Witness: “Yes, it would have.”
(J.A. at 752.)
Dukes contends that this line of questioning ran afoul of the well-settled rule prohibiting the use of guilt-assuming hypothetical questions. See, e.g., United States v. Siers, 873 F.2d 747, 749 (4th Cir.1989) (“[Pjutting to [the witness] a hypothetical fact situation corresponding to the crime for which [the defendant] was being tried, is error, and, again, we neither condone nor excuse the same.”); United States v. Smith, 354 F.3d 390, 396 n. 5 (5th Cir.2003)(“A common vice is for the examiner to couch a question so that it assumes as true matters to which the witness has not testified.... Whether the witness is friendly or hostile, the answer can be misleading.” (internal quotations marks and alterations omitted)). Dukes’s argument, however, misses the mark. The Government’s first question — “Did Mr. Dukes ever tell you ... that none of the three infrastructure companies has any prospect for going public?” — was not “hypothetical” at all. The Government was merely asking the witness for historical information, i.e., whether Dukes had ever expressed doubts to the witness about the infrastructure companies’ financial futures.
The Government’s follow-up question, which asked the witness whether his investment choice would have been different if Dukes had altogether discounted the infrastructure companies’ IPO chances, was hypothetical, but the question did not assume Dukes’s guilt of the charged crimes. Instead, it focused on the materiality of Dukes’s representations about the infrastructure companies’ financial pros *46 pects. In this regard, the question was qualitatively different than the guilt-assuming hypothetical questions proscribed by courts, which assume the defendant’s guilt of the very crime(s) with which he is charged and most often are asked during cross-examination on the heels of testimony about the defendant’s good character or reputation. Cf. United States v. Mason, 993 F.2d 406, 409 (4th Cir.l993)(in a drug distribution case, it was error for government to ask character witness on cross-examination whether his opinion of the defendant would change if he knew that the defendant had “distributed drugs”), United States v. Barta, 888 F.2d 1220, 1224 (8th Cir.1989) (in tax evasion case, holding that it was error for district court to allow prosecutor to ask character witness if his opinion of the defendant “would change if, if the facts showed that he had, in fact, lied on his income tax return”); United States v. Williams, 738 F.2d 172, 177 (7th Cir.1984) (in fraud case, holding it was error for Government to ask character witnesses on cross-examination if their opinions would change if they knew that the defendant had committed the charged fraud). Here, the Government did not ask the fact witness to assume that Dukes committed “fraud.” Dukes’s argument is therefore unavailing.
C.
Dukes also challenges the district court’s admission of the entire consent decree into evidence. Although the Government introduced the consent decree into evidence only for the purpose of getting the findings of fact in paragraph 14 before the jury, the district court, for reasons unclear from the record, admitted the entire consent decree into evidence, despite its earlier instruction to the Government not to reference the Commission’s legal conclusions contained in the decree. Later, during closing argument, the Government urged the jurors to review the consent decree during deliberations. Specifically, the Government counseled the jury in the following way: “If you want to look at [the consent decree] back in the jury room, that’s the exhibit number. This is the one that [defense counsel] almost jumped out of his shoes when I first fried to read from it — you may recall that — a week or so ago.” (J.A. at 1619.)
Dukes’s challenge to the admission of the consent decree in toto is a layered one. He first contends that the district court erred under Federal Rule of Evidence 408 in admitting the entire decree because the decree was offered to prove Dukes’s criminal liability.[10] Alternatively, he argues that the consent decree was inadmissible under Rule 403 because it contained the Maryland Securities Commission’s legal conclusions, neither admitted nor denied by Dukes. He contends that the danger of unfair prejudice to Dukes substantially outweighed the consent decree’s probative value because it contained an administrative body’s conclusions of guilt and because it incorporated many of the accusatory statements from the cease-and-desist order, statements that the district court excluded precisely because of their danger of unfair prejudice to Dukes.
*47 The Government responds that Rule 408 is inapposite here because the consent decree was not offered to prove Duke’s liability under the Maryland securities laws, on which the decree focused. The Government also contends that we must review Dukes’s challenge to the admission of the consent decree for plain error because Dukes failed to object at trial to its admission in toto.
We agree with the Government that plain error review is warranted because Dukes did not object below on Rule 403 or Rule 408 grounds. The Government introduced the consent decree into evidence as “Exhibit 2,” without objection from Dukes, and began reading part of the decree into the record. After the Government had read nearly three full paragraphs of the decree into evidence, Dukes made the following objection: “Your Hon- or, in that document, aside from those specific findings of fact that my client expressly consented to, everything else in that document is the commissioner’s hearsay that has no place before this jury.” (J.A. at 758.) In response, the Government stated that it would “go right to the findings [of fact],” and the district court instructed the Government that it could read into evidence the findings of fact but not the Commission’s legal conclusions. (J.A. at 758.) Despite this instruction, the court allowed the entire decree to be published to the jury.
Federal Rule of Evidence 103 provides that an “[e]rror may not be predicated upon a ruling which admits ... evidence unless a substantial right of the party is affected and ... a timely objection ... appears of record, stating the specific ground for the objection, if the specific ground was not apparent from the context.” Fed.R.Evid. 103(a)(1); see also United States v. Parodi, 703 F.2d 768, 783 (4th Cir.1983) (“[T]he objecting party [must] object with that reasonable degree of specificity which would have adequately apprised the trial court of the true basis for his objection ....”)(internal quotation marks omitted). Here, Dukes did not object until after the district court had admitted the consent decree and permitted the Government to begin reading irom it, and even then, Dukes’s lone objection was that “everything in that document [besides the factual findings] is the commissioner’s hearsay.” (J.A. at 758.) At no point did Dukes object on the grounds that the decree was inadmissible under Rules 403 and 408. It is well-established that a specific objection made on one ground will not preserve appellate review of a different ground. See Exxon Corp. v. Amoco Oil Co., 875 F.2d 1085, 1090 (4th Cir.l989)(citing Wright & Miller for the rule that “a party may not state one ground for objection and attempt to rely on a different ground for appeal”); Udemba v. Nicoli, 237 F.3d 8, 14-15 (1st Cir.2001)(“It is a bedrock rule that a party who unsuccessfully objects to the introduction of evidence on one ground cannot switch horses in midstream and raise an entirely new ground of objection on appeal without forfeiting the usual standard of review.”); 1 Saltzburg, et. al., Federal Rules of Evidence Manual 103-18 (“It is axiomatic that a specific objection made on one ground will not preserve an objection to the same evidence on different grounds.”); United States v. Wilson, 966 F.2d 243, 246 (7th Cir.l992)(holding that an objection on relevance grounds did not preserve objection that evidence is unduly prejudicial under Rule 403). Because Dukes did not object below on Rule 408 or Rule 403 grounds, plain error review is in order.
Under plain error review, Dukes must show that (1) the district court committed an error; (2) the error was plain; and (3) the error affected his substantial rights, *48 i.e., that the error affected the outcome of his trial. United States v. Olano, 507 U.S. 725, 732-34, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993); United States v. Hughes, 401 F.3d 540, 547-48 (4th Cir.2005). If Dukes makes this showing, we should only notice the error if the error “seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.” Hughes, 401 F.3d at 555 (internal quotation marks and citation omitted).
Even if we assume that the district court plainly erred under Rule 403 in admitting the entire consent decree, however, Dukes has not shown that the error affected the outcome of his trial. Evidence at trial showed that many of Dukes’s representations about his investment experience, FWC, and the three infrastructure companies were false. A number of FWC investors testified that they invested in FWC because of Dukes’s representations about his investment and IPO experience, particularly his experience taking Today’s Man public. The Government introduced, without objection, Dukes’s sworn testimony before the Securities and Exchange Commission (SEC) in which he admitted that he did not help any of his Wall Street clients with IPOs and did not participate “in any form or fashion” in taking Today’s Man public. (J.A. at 771). Contrary to what he had told investors, Dukes also testified before the SEC that the former Washington, D.C. banking commissioner he mentioned in presentations was not actively working with Dukes to develop ISI, that ISI officials had not spoken to fifty state banking regulators, and that ISI had not taken any steps toward securing a banking license.[11]
The Government also elicited testimony that contradicted Dukes’s claim that his investment advice had resulted in substantial profits for a Washington, D.C. church and two of its members. James E. Jordan, Jr., a long-time pastor of the church, testified that he had never heard of Dukes, Hodge, or FWC before being contacted by the U.S. Attorney’s Office about the case and that the church had not invested in the stock market at all during the time period in question.
The Government introduced extensive testimony describing FWC’s “money trail” that contradicted Dukes’s claim that he had invested much of his own money in FWC. Kevin DeLacey, a staff accountant in the SEC’s enforcement division, testified that there was no evidence that Dukes and Hodge had made large cash investments in FWC amounting to anywhere near $1 million, although FWC financial records showed that between July 2000 and October 2001 Dukes and Hodge collected in excess of $1.3 million from FWC investors.[12] During that same period, Dukes received $136,805 in salary from FWC and a related entity; paid $4,295.93 in expenses with FWC funds; and withdrew around $85,917 from FWC accounts. Dukes and Hodge spent in excess of *49 $121,000 on travel expenses during the same period.
Given the cumulative evidence of Dukes’s misrepresentations to potential FWC investors and members, and taking into account any error in the admission of the consent decree, we conclude that Dukes has not shown how admission of the consent decree affected his substantial rights because we are assured “that the judgment was not substantially swayed by [any possible] error.” Kotteakos v. United States, 328 U.S. 750, 765, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946).
D.
Dukes’s final evidentiary challenge relates to the district court’s admission of financial summary charts that were used by the Government at trial. Several weeks prior to trial, the Government advised Dukes that it planned to call DeLacey, an SEC accountant, as a fact witness to present summary charts of FWC’s bank records. On April 26, 2005, at a pretrial hearing, Dukes requested that the summary charts be made available to him immediately. On April 28, 2005, the district court ordered that “any summary charts, together with the enumeration of the documents upon which they were based, must be disclosed to the Defendants no later than May 10, 2005.” (J.A. at 60.) The Government made the summary charts available to Dukes on May 19, 2005, nine days after it was supposed to have provided them to Dukes and only five days before trial. Dukes raised the issue of the Government’s untimely production to the district court, but the court overruled his objection.
Two weeks into the trial, Dukes discovered that the Government had failed to make exhibit GX4 available to him before trial. The exhibit was a more detailed version of exhibit GX3, which was provided to Dukes before trial. Instead of excluding exhibit GX4, the district court advised Dukes’s counsel that he could take extra time to review the exhibit before its admission.
Dukes argues that the district court erred under Federal Rule of Evidence 1006 in admitting the summary charts because the Government did not provide the charts to Dukes until five days before trial, and, in the case of summary chart GX4, until after the trial had begun. The Government responds that Rule 1006 only requires that the documents underlying the summary charts, and not the summary charts themselves, be “made available” to the opposing party at a reasonable time and place. Dukes concedes that the Government made the underlying documents available at a reasonable time and place.
Rule 1006 provides:
The contents of voluminous writings, recordings, or photographs which cannot conveniently be examined in court may be presented in the form of a chart, summary, or calculation. The originals, or duplicates, shall be made available for examination or copying, or both, by other parties at reasonable time and place. The court may order that they be produced in court.
Fed.R.Evid. 1006.
The plain language of the rule favors the Government. It requires only that the summarized documents, and not the summaries themselves, be made available to the opposing party at a “reasonable time and place.” In United States v. Foley, 598 F.2d 1323 (4th Cir.1979), the defendant argued that the trial court should have excluded the Government’s summary exhibits because, although the Government made the underlying documents available to the defendant well before the trial, the Government provided the charts them *50 selves to the defendant the weekend before the trial. Id. at 1338. Focusing on the plain language of Rule 1006, we rejected the defendant’s argument, stating that Rule 1006 “refers to making available the original documents, not the charts themselves.” Id.; see also Fid. Nat’l Title Ins. Co. of N.Y. v. Intercounty Nat’l Title Ins. Co., 412 F.3d 745, 753 (7th Cir.2005)(“[Rule 1006] does not say when the summaries must be made available to the party — for that matter, it nowhere states that the summaries must be made available to the opposing party.”).
Dukes correctly points out, however, that “no federal rule is needed ... to empower a district judge to prevent a party from springing summaries of thousands of documents on the opposing party so late in the day that the party can’t check their accuracy against the summarized documents before trial.” Fid. Nat’l, 412 F.3d at 753. Indeed, one prominent treatise has noted that Rule 1006’s purpose is thwarted if the summaries themselves are not provided to the opposing party at a reasonable time “because, without notice of the summaries’ contents, adverse parties cannot know what to look for in the source material to determine if the summaries are accurate.” 31 Charles Alan Wright & Victor James Gold, Federal Practice and Procedure § 8045, at 549 (2000); see also United States v. Janati, 374 F.3d 263, 273 (4th Cir.2004)(“The obvious import of [Rule 1006] is to afford a process to test the accuracy of the chart’s summarization.”). Nevertheless, our review of the record reveals that the district court was keenly aware of the importance of preserving Dukes’s ability to have meaningful cross-examination of the Government’s summary witnesses about the exhibits and that Dukes’s ability to do so was preserved. For example, with respect to summary exhibit GX4, the exhibit provided to Dukes after his trial had begun, the district court carefully considered the possibility of prejudice to Dukes by its late production and ensured that Dukes had ample time to review the exhibit before cross-examination, even requiring the Government to introduce the exhibit out of sequence so that the court and Dukes would have more time to review it. (See, e.g., J.A. at 1074 (regarding summary exhibit GX4: “[I]f he needs additional time to review it, then I can give him that. I don’t want to necessarily keep [the exhibit] out, but I want to make certain that Mr. Stiller [Dukes’s counsel] is armed and dangerous when the time comes to cross examine with enough knowledge of [the exhibit].”).) Given the district court’s sensitivity to preserving Dukes’s opportunity to cross-examine rigorously the Government’s witness about the summary charts, we cannot say that the district court abused its discretion in admitting the charts, particularly in light of our having sanctioned similar practice on very similar facts in Foley.
III.
Dukes also raises a number of challenges to the district court’s application of the Guidelines during sentencing. “In assessing a challenge to a sentencing court’s application of the Guidelines, we review the court’s factual findings for clear error and its legal conclusions de novo.” United States v. Allen, 446 F.3d 522, 527 (4th Cir.2006).
A.
We begin with Dukes’s challenge to the district court’s application of Guideline § 2Fl.l(b)(6)(a), which provides for a two-level enhancement to a defendant’s offense level if “the defendant relocated, or participated in relocating, a fraudulent scheme to another jurisdiction to evade law enforce *51 ment or regulatory officials.” U.S. Sentencing Guidelines Manual § 2F1.1(b)(6)(A) (2000).
Dukes first argues that application of the “relocation” enhancement to his sentence resulted in impermissible double-counting because the conduct justifying application of the enhancement — Dukes’s relocation and re-incorporation of FWC outside of Maryland to circumvent the Maryland Securities Commission cease- and-desist order — was already taken into account by the district court in its application of Guideline § 2Fl.l(b)(4)(C), the enhancement for “violation of any prior, specific judicial or administrative order, injunction, decree, or process nor address elsewhere in the guidelines,” U.S. Sentencing Guidelines Manual § 2Fl.l(b)(4)(C) (2000). In support of his argument, Dukes points to the commentary to § 2Fl.l(b)(4)(C), which states that “[tjhis enhancement does not apply if the same conduct resulted in an enhancement pursuant to a provision found elsewhere in the guidelines.” U.S. Sentencing Guidelines Manual § 2Fl.l(b)(4)(C) cmt. n. 6 (2000).
Dukes’s double-counting argument fails, as it is clear that the district court relied on different conduct in applying the respective enhancements. In applying § 2Fl.l(b)(4)(C), the district court relied on Dukes’s March 7, 2001 presentation of FWC to a group of potential investors in New Jersey and his request for the presentation materials (which still listed Maryland as FWC’s mailing address) to be sent to Maryland, after he learned the same day of the Commission’s cease-and-desist order, which ordered Dukes and Hodge to cease and desist from offering, presenting, or otherwise promoting FWC memberships “in or from” Maryland. In applying the § 2F1.1(b)(6)(A) enhancement, the court relied on Dukes’s re-incorporation of FWC in Washington D.C. and his movement of FWC’s offices to Washington, D.C. Dukes’s double-counting argument is thus without merit.
Alternatively, Dukes contends that the district court erred in applying § 2F1.1(b)(6)(A) because (1) FWC was still doing business in Maryland at the same time that the court deemed Dukes to have relocated FWC to Washington, D.C. and (2) Dukes did not conceal his relocation of FWC. This argument also fails.
First, Dukes concedes that he and Hodge physically moved FWC’s offices to Washington D.C. and re-incorporated FWC there after being served with the cease-and-desist order in Maryland. That FWC continued limited operations in Maryland while Dukes and Hodge both legally and physically moved the locus of the enterprise to another jurisdiction does not render the enhancement inapplicable. Guideline § 2Fl.l(b)(6)(A) applies “[i]f the defendant relocated, or participated in relocating, a fraudulent scheme to another jurisdiction to evade law enforcement or regulatory officials,” id., and we cannot say that the district court erred in finding that Dukes had relocated the scheme to Washington, D.C.
Second, with respect to Dukes’s argument that § 2Fl.l(b)(6)(A) is inapplicable if the defendant did not conceal his relocation activity, there is no language in § 2F1.1(b)(6)(A) that supports such a “concealment” requirement. Although evidence that Dukes concealed his identity or activities would no doubt be relevant to a showing that the relocation was for the purpose of evading the Maryland Securities Commission’s cease-and-desist order, § 2Fl.l(b)(6)(A) contains no requirement of concealment, other than the relocation itself. See United States v. Paredes, 461 F.3d 1190, 1193 (10th Cir.2006)(interpret *52 ing Guideline § 2Bl.l(b)(A), the amended version of § 2Fl.l(b)(6)(A), and holding that the enhancement “contains no requirement of concealment, other than the relocation itself’). The district court therefore did not err in applying § 2Fl.l(b)(6)(A) to Dukes’s sentence because Dukes’s relocation of FWC was enough by itself to evidence evasion of the Maryland Securities Commission.
B.
Dukes also argues that the district court erred in enhancing his sentence pursuant to § 3B1.3 for abusing a “position of trust.” Guideline § 3B1.3 calls for a two-level increase to a defendant’s offense level if “the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense.” U.S. Sentencing Guidelines Manual § 3B1.3 (2000).
“Determining what constitutes a position of trust for the purposes of § 3B1.3 is not a simple task,” United States v. Caplinger, 339 F.3d 226, 236 (4th Cir.2003)(internal quotation marks and alteration omitted), because the “enhancement was not designed to turn on formalistic definitions of job type,” United States v. Gordon, 61 F.3d 263, 269 (4th Cir.1995). “[F]raud alone does not justify the enhancement,” United States v. Bollin, 264 F.3d 391, 415 (4th Cir.2001), nor does a “mere showing that the victim had confidence in the defendant,” Caplinger, 339 F.3d at 237 (internal quotation marks omitted). “Something more akin to a fiduciary function is required.” Id. (internal quotation marks omitted). “Overall, the question of whether a defendant held a position of trust must be approached from the perspective of the victim.” Gordon, 61 F.3d at 269. And “[b]ecause the [position of trust] inquiry requires a ‘sophisticated factual determination,’ a trial court’s finding will be reversed only if clearly erroneous.” Id.
In applying the § 3B1.3 enhancement to Dukes’s sentence, the district court largely focused on Dukes’s marketing of FWC in the church community. In fact, the court stated that Dukes “wouldn’t be where he is today if he hadn’t gone near a church where trust was placed in him.” (J.A. at 1870.) Dukes, however, contends that the religious context of many of his presentations did not “automatically elevate his relationship with the investors to that of a position of trust.” (Appellant’s Br. at 53.)
If the district court had applied the “abuse of trust” enhancement based solely on the religious context of Dukes’s fraud, then we would have little trouble concluding that the court erred. The court did not, however, focus only on the religious context of Dukes’s fraud but also noted that investors had placed trust in Dukes partly because -of “his representations about his skills,” (J.A. at 1870), including noting that Dukes had highlighted for investors his Wall Street experience and his alleged experience taking Today’s Man public. In fact, the court specifically referenced Application Note 2(A) to § 3B1.3, which states that the enhancement applies to a defendant who “perpetrates a financial fraud by leading an investor to believe the defendant is a legitimate investment broker.” U.S. Sentencing Guidelines Manual § 3B1.3 cmt. n. 2 (2000). As noted earlier, a number of FWC investors testified that they invested in FWC because of Dukes’s investment experience, and one investor in particular testified that his investment decision was greatly influenced by Dukes’s representation that he was a “legitimate stockbroker.” (J.A. at 319.)
Given its attention to Dukes’s representations about his investment experience, we cannot say that the district court clearly erred in its application of § 3B1.3 to *53 Dukes’s sentence. From the perspective of the FWC investor, Dukes’s representations about his time on Wall Street, his experience taking companies public, and his previous clients’ investment successes would have been key components in the overall decision to invest and created “[something more akin to a fiduciary duty” owing from Dukes to the FWC investors. Caplinger, 339 F.3d at 237. (J.A. at 319.) We therefore reject Dukes’s argument.
C.
Finally, Dukes argues that the district court erred in enhancing his sentence pursuant to Guideline § 3Bl.l(c), the enhancement for “aggravating role,” because the court erroneously concluded that § 3B 1.1(c) does not require that the defendant organize, lead, manage, or superase at least one other participant in the crime. The Government responds that under § 3B1.1(c) a defendant need not organize, lead, manage, or superase another participant so long as the defendant exercises significant management responsibility over the criminal organization’s property and assets. Alternatively, the Government argues that even if the enhancement does require management of at least one other criminal participant, the district court found that Dukes had exercised such leadership over Hodge.
Dukes has the better of the argument. Guideline § 3B1.1(c) provides for a two-level increase if “the defendant was an organizer, leader, manager, or supervisor in any criminal activity.” U.S. Sentencing Guidelines Manual § 3B1.1(c) (2000). Application Note 2 to § 3B1.1 makes clear that
[t]o qualify for an adjustment under this section, the defendant must have been the organizer, leader, manager, or supervisor of one or more other participants. An upward departure may be warranted, however, in the case if a defendant who did not organize, lead, manage, or supervise another participant, but who nevertheless exercised management responsibility over the property, assets, or activities of a criminal organization.
U.S. Sentencing Guidelines Manual § 3B1.1 cmt. n. 2 (emphasis added). “Participant” is defined as “a person who is criminally responsible for the commission of the offense, but need not have been convicted.” Id. cmt n. 1. There is a clear distinction between an adjustment under § 3B1.1, which requires that a defendant have been the organizer, leader, manager, or supervisor of one or more other participants, and an upward departure under § 3B1.1, which can be based solely on the defendant’s exercise of “management responsibility over the property, assets, or activities of a criminal organization.” Thus, the plain language of the commentary makes clear that for enhancement purposes the defendant must have organized, led, managed, or supervised at least one other criminal participant. See United States v. Sayles, 296 F.3d 219, 226 (4th Cir.2002) (stating that § 3B1.1(c) only applies when the defendant was an “organizer, leader, manager or supervisor of people ” (emphasis in original)); United States v. Capers, 61 F.3d 1100, 1109 (4th Cir.1995) (noting the same).
Contrary to the Government’s contention, the district court did not base its application of the enhancement on Dukes’s control of Hodge. Instead, the court applied § 3Bl.l(c) because it concluded that the enhancement does not require that the defendant control another criminal participant. The district court reasoned as follows:
3B1.1(a) talks about an organizer or leader of an activity involving five or *54 more participants. And [3B1.1(c) ] simply comes back to being an organizer, leader, manager or supervisor in any criminal activity and does not use the term participant at all. It is clear that Mr. Dukes was an organizer of the vehicle that used to carry out these crimes, the Financial Warfare Club, and I, therefore, conclude that this aggravating role adjustment is appropriate.
(J.A. at 1868-69.)
The court’s legal conclusion that the enhancement under § 3Bl.l(e) does not require control of at least one other participant in the crime is clearly erroneous in light of the commentary to § 3B1.1 and our decisions in Sayles and Capers. We therefore remand to the district court for resentencing.[13]
IV.
In sum, we affirm Dukes’s convictions, but we remand this case to the district court for resentencing because the court erred in its application of the “aggravating role” enhancement.

AFFIRMED IN PART, VACATED IN PART, AND REMANDED.

. FWC listed its principal office as 12138 Central Avenue, Suite 233, Mitchellville, Maryland, 20721, which was the address for a mailbox at a Mailboxes, Etc. location.

. Citations to the "J.A." refer to the Joint Appendix filed with this appeal.

. As a pastoral liaison, Hairston reached out to other clergy and church communities to generate interest in FWC and schedule presentations for Dukes and Hodge.

. For example, in October 2000, Dukes told potential investors that GCI would go public before the end of the year, but then, only a few weeks later during another presentation, he told another group of prospective FWC investors that GCI would go public in four to six months.

. As of the date of the cease-and-desist order, FWC had fewer than 1,000 investors.

. One of the Commission’s legal conclusions was that Dukes and Hodge "made material misrepresentations or omissions in connection with the offer or sale of securities.” (J.A. at 1917.) The Commission ordered that Dukes and Hodge "permanently cease and desist from misrepresentation or omission of material facts that would constitute fraud” and "permanently cease and desist from engaging in fraudulent investment advisory activities.” (J.A. at 1917.)

. On the Government’s motion, the district court dismissed three of the counts against Dukes.

. The district court severed Hodge’s trial.

. Specifically, Dukes objected to the Government's questions on the grounds of their "irrelevance” and "impropriety.” (J.A. at 751.) It is clear from the context that Dukes’s objection was on the ground that the questions, being irrelevant, might mislead or confuse the jury-

. At the time of Dukes’s trial, Rule 408 provided in pertinent part:
Evidence of (1) furnishing or offering or promising to furnish, or (2) accepting or offering or promising to accept, a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount, is not admissible to prove liability for or invalidity of the claim or its amount. Evidence of conduct or statements made in compromise negotiations is likewise not admissible.
Fed.R.Evid. 408 (2005).

. At trial, Dukes implicitly blamed divine inspiration for his "misstatement” about ISI. After acknowledging that ISI had not taken any of the steps that he claimed, Dukes defended, "Again, to understand, this is ministry. So as you get inspired, that may be a misstatement on my part....” (J.A. at 371.)

. In fact, Dukes’s testimony before the Maryland Securities Commission, the SEC, and at trial produced three different amounts for his personal investment in FWC. Acknowledging that he had told investors that he and Hodge had invested approximately $1,000,000 to $1,500,000 of their own money in FWC, Dukes testified at trial that he had personally invested $600,000 to $700,000; testified before the Maryland Securities Commission that he had invested $100,000 of his own money; and testified before the SEC that he had invested only $75,000 of his own money.

. Of course, on remand, the district court is free to enhance Dukes’s sentence under § 3B1.1(c) if the court finds that Dukes organized, led, managed, or supervised at least one other criminal participant. We express no opinion on this issue.