**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 06-5281**

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

TERESA HODGE,

Defendant – Appellant.

Appeal from the United States District Court for the District of Maryland, at Greenbelt.  Roger W. Titus, District Judge.  (8:03-cr-00133-RWT)

Submitted:  September 11, 2008      Decided:  October 3, 2008

Before TRAXLER, Circuit Judge, HAMILTON, Senior Circuit Judge, and James C. DEVER III, United States District Judge for the Eastern District of North Carolina, sitting by designation.

Affirmed in part; vacated and remanded in part by unpublished per curiam opinion.

David Schertler, SCHERTLER & ONORATO, L.L.P., Washington, D.C., for Appellant.  Rod J. Rosenstein, United States Attorney, Baltimore, Maryland; Bryan E. Foreman, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Greenbelt, Maryland, for Appellee.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Teresa Hodge (Hodge) appeals her convictions on six counts of mail fraud, 18 U.S.C. § 1341, seven counts of interstate transportation of property obtained by fraud, 18 U.S.C. § 2314, and one count of money laundering, 18 U.S.C. § 1957(a). Hodge also appeals her sentence of eighty-seven months' imprisonment. We affirm Hodge's convictions in toto, but vacate her sentence and remand for resentencing absent application of the sentencing enhancement imposed pursuant to USSG § 3B1.1(c) (2000) in calculating her advisory sentencing range under the United States Sentencing Guidelines.

I.

In 2000, Hodge and Marcus Dukes founded the Financial Warfare Club (FWC) as a Maryland nonprofit corporation.[1] The pair, who are both African-Americans, purportedly created FWC to generate wealth within the African-American community by promoting investment literacy among those who typically lacked knowledge of financial markets and by providing investment

---

[1] FWC listed its principal office as 12138 Central Avenue, Suite 233, Mitchellville, Maryland, 20721, which address actually was the address for a mailbox at a Mailboxes, Etc. location.

opportunities in companies that would generate revenue that would stay within the African-American community.

Hodge and Dukes primarily sought to grow FWC through live presentations to African-American clergy and their respective congregations. The pastor of the hosting church usually introduced Hodge and Dukes to the attendees at the presentations. The pair would then make material misrepresentations to the attendees in order to induce them to become a member of FWC at one of three membership levels.

The top level required a $2,550.00 investment, the middle level a $1,050.00 investment, and the lowest level a $550.00 investment. The top level entitled the member to three financial literacy courses; 2,000 shares of stock in each of three infrastructure companies that Hodge and Dukes were purportedly developing; and the opportunity to buy additional shares of stock in those companies at reduced prices before their initial public offerings (IPOs). The middle level entitled the member to two financial literacy courses, 500 shares of stock in each of the three infrastructure companies, and the same opportunity to purchase more shares at pre-IPO prices. The least expensive level entitled the member to one financial literacy course, 250 shares of stock in each of the three infrastructure companies, and the opportunity to buy more shares at pre-IPO prices.

Among other items, Hodge claimed that the African-American community had been intentionally locked out of achieving financial success on Wall Street via the sophisticated investor accreditation rules of the Securities and Exchange Commission of the United States (the SEC). Hodge held out FWC as a mechanism for African-Americans to bypass such rules. In this vein, Hodge falsely told attendees at FWC presentations that if a potential investor did not have an income of at least $200,000.00 during the previous three years, the SEC's sophisticated investor accreditation rules prohibited such person from investing in an initial public offering of stock (IPO).

Hodge also falsely told attendees at FWC presentations that Dukes had considerable investment experience on Wall Street, including having personally taken the retail clothing store Today's Man public. Hodge also knew that Dukes often falsely told attendees at FWC presentations that he had given financial advice to a church in Washington, D.C. and, as a result, the church made $50,000 and two church members bought matching Porsche automobiles with their profits.

Hodge, as well as others who introduced her during the presentations, told attendees that she was a wealthy woman with decades of business experience. Hodge also told the attendees that she had personally invested $1,000,000.00 in FWC. The

- 4 -

evidence at trial proved all of these representations to be false and misleading.

After making numerous FWC presentations to African-American churches in Maryland, Hodge and Dukes took FWC on the road, giving presentations at numerous churches throughout Georgia, Michigan, Ohio, New York, New Jersey, and Alabama. When it became apparent that FWC's promised benefits (financial literacy courses and IPO profits) were not forthcoming, a number of FWC members requested a refund of their investments. Only a handful of members actually received a refund. When Dukes failed to respond timely to some FWC members' complaints, some of those members complained about FWC to the Maryland Attorney General's Office.

On March 5, 2001, the Maryland Securities Commissioner issued a cease-and-desist order (the Cease and Desist Order or Exhibit Maryland 1) against Dukes, Hodge, and FWC, ordering them to stop offering or selling unregistered securities, including memberships in FWC, and to stop violating the anti-fraud provision of the Maryland Securities Act, Md. Code Ann., Corps. & Ass'ns §§ 11-101 to 11-805. Hodge received her copy of the Cease and Desist Order on March 7, 2001.

Approximately one week later, on March 13, 2001, Dukes incorporated a new FWC entity in Washington, D.C. Around the same time, FWC moved out of its Maryland office.

On April 10, 2002, Hodge and Dukes entered into a consent decree with the Maryland Securities Commission (the Consent Decree). Pursuant to the terms of the Consent Decree, Hodge and Dukes admitted to certain facts, including the fact that they had raised approximately $800,000.00 from about 800 FWC members, they had provided no financial literacy courses to FWC members, and none of the three infrastructure companies had any prospect of going public. The Consent Decree also contained the Maryland Securities Commission's legal conclusions that Hodge and Dukes had committed securities and investment fraud under the Maryland Securities Act, which the pair neither admitted nor denied. In the Consent Decree, the Commission also repeated its orders to Hodge and Dukes to cease and desist from engaging in fraudulent investment activities.

In December 2003, Hodge and Dukes were indicted by a federal grand jury for mail fraud, interstate transportation of property obtained by fraud, and money laundering. A fourteen-count second superseding indictment naming only Hodge was returned on November 28, 2005. The district court severed the cases for purposes of trial.

On June 8, 2005, a jury convicted Dukes on all but three counts, which three counts the district court had dismissed on the government's motion. On July 3, 2007, we affirmed Dukes'

convictions, but remanded for resentencing. United States v. Dukes, 242 Fed. Appx. 37 (4th Cir. July 3, 2007) (unpublished).

On June 6, 2006, following a three-week trial, the jury convicted Hodge on all counts. The district court sentenced Hodge to eighty-seven months' imprisonment.[2] Hodge noted this timely appeal.

II.

The first issue on appeal concerns the Cease and Desist Order. Notably, Hodge premises several of her arguments with respect to this issue upon her claim that the entirety of the Cease and Desist Order, a.k.a., Exhibit Maryland 1, was sent to the jury room for the jury's consideration during its deliberations. In contrast to Hodge's version of events, in its appellate brief, the government claimed the jury's only exposure to the text of the Cease and Desist Order occurred during the direct testimony of government witness Ronald Wilson, when the government read certain portions of such document into evidence while the same portions appeared simultaneously before the jury on a large video screen in the courtroom, known as the ELMO. Ronald Wilson was a securities fraud investigator with the

---

[2] The district court used the 2000 version of the United States Sentencing Guidelines Manual (effective November 1, 2000) in calculating Hodge's advisory sentencing range.

Maryland Attorney General's Office during the time that Hodge and Dukes operated FWC. As part of his investigation of FWC, Ronald Wilson attended a FWC presentation at a church in Maryland. He also served the Cease and Desist Order on Dukes.

After the completion of all appellate briefing, we remanded this case to the district court for a factual finding concerning the extent of the jury's actual exposure to the contents of the Cease and Desist Order (Exhibit Maryland 1) during Hodge's trial and ordered this appeal held in abeyance pending further order of this court. On remand, the district court agreed with the government's version, finding that the Cease and Desist Order did not go to the jury room during deliberations, and that the jury only heard the portions of the Cease and Desist Order read into evidence by the government and put on the ELMO for the jury's viewing during the government's direct examination of Ronald Wilson.

This appeal is now back before us. The following portions of the Cease and Desist Order are the only portions of such order presented to the jury which are potentially troublesome from a Federal Rule of Evidence 403 (Rule 403) perspective. Those portions are: (1) "ORDERED, that Financial Warfare, Hodge and Dukes and anyone under their direction . . . cease and desist from violating the anti-fraud provisions of the [Maryland] Securities Act," (J.A. 506); (2) "ORDERED that

respondents cease and desist from engaging in material misrepresentations or omissions in connection with the offer or sale of securities in this State," (J.A. 516); and (3) "ORDERED that respondents cease and desist from engaging in material misrepresentations or omissions in connection with the offer of investment advice in this State." (J.A. 517).

Without the Cease and Desist Order having been sent to the jury room, Hodge is left with her arguments that the portions of the Cease and Desist Order that were read into the record and simultaneously put on the ELMO violated her right to confront witnesses against her under the Sixth Amendment to the United States Constitution, as articulated in Crawford v. Washington, 541 U.S. 36 (2004). Alternatively, she argues that the portions of the Cease and Desist Order that were read into the record and simultaneously put on the ELMO violated Rule 403. Neither argument has merit.

A.    Confrontation Clause Argument.

The Sixth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. In Crawford, the Supreme Court held that the Confrontation Clause prohibits the "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for

cross-examination." Crawford, 541 U.S. at 53-54. "Only [testimonial] statements . . . cause the declarant to be a 'witness' within the meaning of the Confrontation Clause. It is the testimonial character of the statement that separates it from other hearsay that, while subject to traditional limitations upon hearsay evidence, is not subject to the Confrontation Clause." Davis v. Washington, 547 U.S. 813, 821 (2006) (citation omitted).

Hodge's Confrontation Clause argument is without merit. First, in the form of allegations and orders, the language of the Cease and Desist Order is obviously not testimonial in nature. Second, the allegations and ordering language are not hearsay because the government did not introduce them for the truth of the matter asserted, see Fed. R. Evid. 801(c), but rather to establish that Hodge was on notice of the allegations and the ordering language set forth in the Cease and Desist Order, and nonetheless, continued uninterrupted in her active role in recruiting FWC members. Such evidence was probative of Hodge's fraudulent intent.

B. Rule 403 Argument.

In relevant part, Rule 403 provides that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice . . . ." Fed. R. Evid. 403. According to Hodge, the portions

- 10 -

of the Cease and Desist Order heard by the jury and put on the ELMO for the jury's viewing "created an extreme danger that the jury would infer guilt on the part of Hodge in light of the fact that the Cease and Desist Order made it appear that the State of Maryland had already made such findings." (Hodge's Reply Br. at 10).

We disagree. Even if we assume arguendo that the district court erred under Rule 403 in allowing the jury to see or hear any portion of the Cease and Desist Order, we can say with fair assurance that, without stripping the assumed erroneous admission from the whole, the jury's verdict was not substantially swayed by the error. United States v. Curbelo, 343 F.3d 273, 286 (4th Cir. 2003). Accordingly, any error would be harmless. In reaching this conclusion, we are mindful that we rejected, on the same rationale, Dukes' evidentiary challenge to the admission of the entirety of the Consent Decree during his trial, which decree having contained the Maryland Securities Commission's legal conclusions that Hodge and Dukes had committed securities and investment fraud under the Maryland Securities Act, contained far more prejudicial information than the Cease and Desist Order. See United States v. Dukes, 242 Fed. Appx. 37, 48 (4th Cir. July 3, 2007) (unpublished).

In sum, we hold the district court did not commit reversible error when it allowed the government to read certain

- 11 -

portions of the Cease and Desist Order into the record and to put the same portions on the ELMO for the jury's viewing, all during the direct testimony of government witness Ronald Wilson.[3]

III.

With respect to her sentence, Hodge first argues that the district court engaged in impermissible double-counting when it increased her offense level by two levels, pursuant to USSG § 2F1.1(b)(4)(C) (2000), and increased her offense level by another two levels, pursuant to USSG § 2F1.1(b)(6)(A) (2000). According to Hodge, these two sentencing enhancements impermissibly punish the same conduct in her case.

When determining a sentence, the district court must calculate the appropriate advisory guideline range under the United States Sentencing Guidelines (the Guidelines) and consider it in conjunction with the factors set forth in 18 U.S.C. § 3553(a). Gall v. United States, 128 S. Ct. 586, 596 (2007). In reviewing the district court's application of the

---

[3] We have also carefully reviewed and reject as without merit Hodge's remaining two challenges to her convictions: (1) that the district court committed reversible error by denying her motion for a mistrial based upon the government's brief reference to Timothy McVeigh during its rebuttal closing argument; and (2) that the testimony of securities law expert Michael Ferraro should have been excluded as irrelevant and unfairly prejudicial. Neither argument warrants further discussion.

Guidelines, we review findings of fact for clear error and questions of law de novo. United States v. Green, 436 F.3d 449, 456 (4th Cir. 2006).

Hodge's double-counting argument is without merit. USSG § 2F1.1(b)(4)(C) provides for a two-level increase if the offense involved "a violation of any prior, specific judicial or administrative order, injunction, decree, or process not addressed elsewhere in the guidelines . . . ." Id. (emphasis added). See also USSG § 2F1.1(b)(4)(C) (2000), comment. (n.6) ("This enhancement does not apply if the same conduct resulted in an enhancement pursuant to a provision found elsewhere in the guidelines."). USSG § 2F1.1(b)(6)(A) (2000) provides for a two-level increase if "the defendant relocated, or participated in relocating, a fraudulent scheme to another jurisdiction to evade law enforcement or regulatory officials . . . ." Id.

Here, the district court increased Hodge's offense level by two levels, pursuant to USSG § 2F1.1(b)(4)(C) (2000), based upon Hodge's violation of the Cease and Desist Order by continuing to make sales presentations and to accept new members in FWC (with membership applications directed to a mailing address for FWC in Maryland) after she received the Cease and Desist Order. The district court then increased Hodge's offense level by two levels, pursuant to USSG § 2F1.1(b)(6)(A) (2000), based upon her

and Dukes' relocation of FWC to Washington, D.C., to evade the jurisdiction of the Maryland Securities Commission.

Contrary to Hodge's position, the district court based these two enhancements on different conduct. Notably, in sentencing Dukes, the district court applied these same two enhancements, and we rejected Dukes' identical double-counting argument on the same basis. See Dukes, 242 Fed. Appx. at 51. In sum, we reject Hodge's double-counting argument as without merit.


IV.

Hodge further contends the district court erred when it increased her offense level by two levels, pursuant to USSG § 3B1.1(c) (2000), for her alleged aggravating role in the offense. The government concedes that Hodge's sentence should be vacated and the case remanded for Hodge's resentencing absent the two-level increase in her offense level imposed pursuant to USSG § 3B1.1(c)(2000). We agree.

USSG § 3B1.1(c) (2000) provides for a two-level increase "[i]f the defendant was an organizer, leader, manager, or supervisor in any criminal activity . . . ." Id. Application Note 2 to this guideline makes clear that "[t]o qualify for an adjustment under this section, the defendant must have been the organizer, leader, manager, or supervisor of one or more other

participants." USSG § 3B1.1(c) (2000), comment. (n.2). Application Note 1 defines "participant" as "a person who is criminally responsible for the commission of the offense, but need not have been convicted." Id. comment. (n.1).

Here, the district court based its application of USSG § 3B1.1(c) (2000) on Hodge's recruitment and supervision of church leaders, in particular Pastor Samuel Hairston and Bishop Ralph Dennis. However, as the government concedes, at Dukes' resentencing on October 12, 2007, the district court found that Pastor Samuel Hairston and Bishop Ralph Dennis were not "other participants" in Dukes and Hodge's scheme to defraud, within the meaning of USSG § 3B1.1(c) (2000), comment. (n.2). Thus, the basis upon which the district court applied USSG § 3B1.1(c) (2000) in sentencing Hodge is infirm. Accordingly, we vacate Hodge's sentence on this basis and remand for resentencing absent application of the two-level increase pursuant to USSG § 3B1.1(c) (2000).[4]

---

[4] We have carefully reviewed and find without merit Hodge's two remaining challenges to her sentence: (1) that the district court erred in increasing her offense level by two levels, pursuant to USSG § 3C1.1 (2000), for obstruction of justice; and (2) that the district court erred by using the preponderance of the evidence standard instead of the more rigorous beyond a reasonable doubt standard in making its factual findings for purposes of calculating her advisory sentencing range under the Guidelines. Neither argument warrants further discussion.

V.

In conclusion, we: (1) affirm Hodge's convictions <u>in toto</u>; and (2) vacate her sentence and remand for resentencing absent application of a two-level increase in her offense level pursuant to USSG § 3B1.1(c) (2000).

<u>AFFIRMED IN PART;</u>
<u>VACATED AND REMANDED IN PART</u>